# United States Court of Appeals
## For the Eighth Circuit

_____

No. 17-3727
_____

United States of America

*Plaintiff - Appellant*

v.

Samantha Flute

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of South Dakota - Aberdeen

_____

Submitted: November 16, 2018
Filed: July 5, 2019

_____

Before COLLOTON, SHEPHERD, and STRAS, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

After the death of Samantha Flute's newborn baby due to combined drug toxicity, the United States charged her with one count of involuntary manslaughter committed within Indian Country, in violation of 18 U.S.C. §§ 1112 and 1153. Flute filed a motion to dismiss the Indictment on the grounds that the charged offense did not cover her or her conduct, and the district court granted the motion. The United States appeals. Having jurisdiction pursuant to 28 U.S.C. § 1291, we reverse.

On August 19, 2016, Samantha Flute arrived at a Sisseton, South Dakota hospital in full-term labor. She gave birth at 38 weeks gestation to a fully developed baby boy, Baby Boy Flute. Baby Boy Flute was well developed, normal and intact, with no obvious signs of trauma or injury, but died approximately four hours after birth. At the time of admission, Flute tested positive for cocaine and a number of prescription and over-the-counter drugs. During efforts to resuscitate Baby Boy Flute, Flute admitted that she had, shortly prior to his birth, taken three times the daily dose of Lorazepam, which had been prescribed to her during her only prenatal medical visit less than one week before Baby Boy Flute's birth; she had snorted hydrocodone, which she believed to have been laced with cocaine based on the feeling it gave her; and ingested cough medicine. Flute admitted that she knew that ingesting these substances was against the best interests of Baby Boy Flute, but that she did so because she needed to get high. An autopsy confirmed that Baby Boy Flute had no anatomical cause of death, but noted the presence of several substances that had not been medically administered to Baby Boy Flute while he was alive. The forensic pathologist who performed the autopsy concluded that Baby Boy Flute had died from combined drug toxicity due to the substances Flute ingested while Baby Boy Flute was still in utero.

The government indicted Flute on one count of involuntary manslaughter. The Indictment specifically charged the following:

> Between on or about August 19, 2016 and August 20, 2016, in Agency Village, in Indian country, in the District of South Dakota, Samantha Flute, an Indian, unlawfully killed a human being, Baby Boy Flute, without malice, in the commission of a lawful act in an unlawful manner which might produce death. Such act was committed in a grossly negligent manner, with actual knowledge that her conduct was a threat to the life of another and with actual knowledge that would reasonably

enable her to foresee the peril to which her act subjected another, to wit: Samantha Flute did unlawfully kill Baby Boy Flute by ingesting prescribed and over-the-counter medicines in a grossly negligent manner, and did thereby commit the crime of involuntary manslaughter, in violation of 18 U.S.C. §§ 1153 and 1112.

Indictment 1-2, Dist. Ct. Dkt. 2. Flute filed a motion to dismiss the Indictment. She admitted that she gave birth to an alive Baby Boy Flute, but argued that even if she had engaged in the conduct alleged in the Indictment, the conduct did not constitute the charged offense under federal law because § 1112 was not intended to apply to a mother's conduct with respect to her unborn child. She also asserted that she could not be charged under § 1112 because an unborn child is not a "human being" for the purposes of that statute. Flute also asserted that the involuntary manslaughter statute was unconstitutionally vague as applied to her.

The district court granted the motion to dismiss the Indictment, holding that the involuntary manslaughter statute did not apply to Flute because she was not within the class of defendants under the statute. In reaching this conclusion, the district court acknowledged that "Baby Boy Flute is within the class of victims Congress historically intended to protect under 18 U.S.C. § 1112." It nevertheless imported language from 18 U.S.C. § 1841 that bars "prosecution . . . of any woman with respect to her unborn child" to find that § 1112 did not reach Flute. The district court read this provision as "creat[ing] a class of persons who cannot be prosecuted under the federal criminal statutes for injury caused to an unborn child," and ultimately concluded that the provision was "a clear statement from Congress that the federal assault and murder statutes cannot be applied to the pregnant woman herself for any actions she takes with respect to her unborn child." United States v. Flute, No. 1:17-CR-10017-CBK, 2017 WL 5495170, at *3 (D.S.D. Nov. 14, 2017). The district court thus determined that, but for the § 1841 exception for mothers, Flute would have been an appropriate defendant. The district court did not address Flute's as-applied constitutional challenge.

-3-

On appeal, the government asserts that the district court erroneously imported the § 1841 exception in determining that the federal involuntary manslaughter statute did not extend to the class of defendants of which Flute was a part—mothers who inflicted injury upon their unborn while the child was still in utero, leading to the child's death after birth. Rather, the government contends that § 1841 is a separate, unrelated, and uncharged statute without relevance to the application of the manslaughter statute to actions of a mother against her unborn child. Flute responds that the district court correctly applied § 1841 and also asserts that the Indictment should have been dismissed because Baby Boy Flute was not a human being when the injuries were sustained in utero and thus § 1112 does not criminalize Flute's conduct.

II.

"We review de novo a district court's dismissal of an indictment for failure to state an offense." United States v. Steffen, 687 F.3d 1104, 1109 (8th Cir. 2012). "An indictment is legally sufficient on its face if it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which [s]he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to subsequent prosecution." United States v. Fleming 8 F.3d 1264, 1265 (8th Cir. 1993). In determining whether a charged crime encompasses the conduct alleged, the court engages in statutory interpretation; the "starting point in interpreting a statute is always the language of the statute itself." United States v. Jungers, 702 F.3d 1066, 1069 (8th Cir. 2013) (quoting United States v. S.A., 129 F.3d 995, 998 (8th Cir. 1997)).

Flute was indicted for involuntary manslaughter under 18 U.S.C. § 1112, which criminalizes "the unlawful killing of a human being without malice . . . in the commission . . . without due caution and circumspection, of a lawful act which might produce death" and under § 1153, which provides federal jurisdiction over crimes in

Indian Country.  The dispositive questions on appeal are whether Baby Boy Flute is within the class of victims protected by § 1112 and whether Flute is within the class of defendants covered by § 1112.

A.

Turning to the first question, we assess whether Baby Boy Flute, who sustained injuries in utero that caused his death after birth, falls within the class of victims protected by § 1112.  Flute asserts that Baby Boy Flute does not because he was not a human being at the time the conduct which ultimately caused death occurred.  We disagree with this contention and agree with the district court that Baby Boy Flute is a proper victim under the federal involuntary manslaughter statute.

In 2002, Congress passed the Born Alive Infants Protection Act, which defines the term "human being" for all Acts of Congress:

> In determining the meaning of any Act of Congress, or of any ruling, regulation, or interpretation of the various administrative bureaus and agencies of the United States, the words "person", "human being", "child", and "individual", shall include every infant member of the species homo sapiens who is born alive at any stage of development.

1 U.S.C. § 8(a).  The Act further defines "born alive" as

> the complete expulsion or extraction from his or her mother of that member, at any stage of development, who after such expulsion or extraction breathes or has a beating heart, pulsation of the umbilical cord, or definite movement of voluntary muscles, regardless of whether the umbilical cord has been cut, and regardless of whether the expulsion or extraction occurs as a result of natural or induced labor, cesarean section, or induced abortion.

Id. § 8(b). Under this definition, the uncontested fact that Baby Boy Flute survived for several hours after his birth—complete expulsion or extraction from his mother—until succumbing to the drugs in his system would establish that he was "born alive." Because he was born alive, under the plain language of these statutes, Baby Boy Flute was a "human being." And because the language of the manslaughter statute plainly encompasses the death of a born-alive child—a child at the earliest possible moment that it exists outside of the womb—the statute necessarily extends to conduct that occurred in utero and caused death to this born-alive child. Baby Boy Flute's death and Flute's conduct while pregnant thus fall within the ambit of the involuntary manslaughter statute.

As the district court noted, this conclusion is consistent with the common-law understanding of the "born alive" rule, whereby liability extended to the death of a child born alive related to injuries received in utero. See United States v. Spencer, 839 F.2d 1341, 1343 (9th Cir. 1988) ("[I]t was well-established in common law that murder was the killing of one human being by another, and that an infant born alive that later died as a result of fetal injuries was a human being. . . . In view of Congress's intent to reflect the state and common-law definition of murder when it passed the statute, and the state and common-law acceptance of infants who died subsequent to birth due to fetal injuries as human beings, it seems clear that Congress intended fetal infanticide to be included within the statutory definition of 'murder' under 18 U.S.C. § 1111."). We need not resolve Flute's argument that Baby Boy Flute was not a "human being" while in utero to determine that Baby Boy Flute is within the class of victims protected by § 1112 because application of the born-alive statute hinges on the time of the born-alive child's death, not initial injury. We further note that Flute's argument is inconsistent with the common law understanding that homicide does not occur unless and until the victim actually dies; because death completes the offense of manslaughter, the victim's status at death is the determination rather than the victim's status when the injuries were sustained. See 1 Wayne R. LaFave, Substantive Criminal Law § 1.2(c) (3d ed 2018); cf. 2 id.

§ 14.1(e). Baby Boy Flute is thus within the class of victims described under § 1112, regardless of whether he was or was not (as Flute argues) a human being when he sustained injuries in utero.

B.

We next turn to whether Flute falls within the class of defendants recognized by § 1112; that is, whether the statute extends criminal culpability to a mother for actions against her unborn child. Although the plain language of § 1112 and the Born Alive Infants Protection Act plainly encompasses Flute and her conduct, the district court erroneously utilized a separate, unrelated, and uncharged statutory provision to exclude Flute's conduct from § 1112. The district court relied on the Unborn Victims of Violence Act, which "recognizes unborn children as a class of victims not previously protected under federal law and criminalizes the killing or injuring of unborn children during the commission of certain federal offenses." United States v. Montgomery, 635 F.3d 1074, 1086 (8th Cir. 2011). This Act creates a separate offense for an individual who engages in any of a list of enumerated crimes, including involuntary manslaughter, which results in "the death of, or bodily injury . . . to, a child, who is in utero at the time the conduct takes place . . . ." 18 U.S.C. § 1841. Section 1841 thus has the effect of expanding the reach of numerous federal criminal statutes to protect unborn victims.

Despite the fact that § 1841 expands criminal culpability for crimes against the unborn, the district court relied on an exception in this section to conclude that the involuntary manslaughter statute did not encompass Flute's conduct as the mother of the unborn child. Section 1841 contains an exception that bars prosecution of a mother for actions taken against her own unborn child. 18 U.S.C. § 1841(c)(3) ("Nothing in this section shall be construed to permit the prosecution . . . of any woman with respect to her unborn child."). Although neither 18 U.S.C. § 1112 nor 1 U.S.C. § 8(a) contain a similar exception, the district court concluded that the

-7-

exception in § 1841 was a "clear statement from Congress that the federal assault and murder statutes cannot be applied to the pregnant woman herself for any actions she takes with respect to her unborn child." Flute, 2017 WL 5495170, at *3.

The district court's reliance on § 1841 was in error. Our Court has previously determined § 1841 has no applicability or reach beyond its own provisions. Montgomery, 635 F.3d at 1086 (rejecting government's argument that attempted to read the definition of "unborn child" in 18 U.S.C. § 1841 into the definition of person in 18 U.S.C. § 1201(a) (kidnapping resulting in death) and noting that the definition of "unborn child" in § 1841 was limited to that section only). The words "[n]othing in *this section*" make clear that any limitations or exceptions in § 1841 apply only to § 1841 and cannot be used as a basis to impose a limitation on other, unrelated statutory provisions. Had Congress intended the § 1841 exception for conduct of a mother to her own unborn child to apply more broadly, it would have expressly stated so. See Jungers, 702 F.3d at 1075 (stating that "Congress knows how to craft an exception . . . when it intends one" (quoting Jonah R. v. Carmona, 446 F.3d 1000, 1007 (9th Cir. 2006))). We will not read an exception into a statutory provision where it does not exist. Thus, § 1841 does not create an exception for Flute.

The district court also based its holding on its discussion of the potential ramifications of applying the federal involuntary manslaughter statute to Flute, particularly noting its reluctance to expand the statute to reach a wide variety of conduct that, in the district court's view, Congress never intended to criminalize. But such considerations are beyond the scope of our review. Our task in considering issues of statutory interpretation is to do just that: interpret the statute as written. See Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54, (1992) "[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."). The language of the relevant statutory provisions clearly states that the federal involuntary manslaughter

-8-

statute applies to a child born alive, who later succumbed to injury suffered in utero, even where that injury was inflicted by the unborn child's own mother.[1] Our task does not involve passing judgment on the wisdom of a given statutory provision or opining on how that statute may be used in the future. Those questions are best left for the legislative body, not the judicial branch. See Ferguson v. Skrupa, 372 U.S. 726, 730 (1963) ("[C]ourts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws. . . . We refuse to sit as a superlegislature to weigh the wisdom of legislation . . . ." (internal quotation marks and citation omitted)).

The federal involuntary manslaughter statute criminalizes the killing of a "human being," which Congress has clearly defined as including a child "born alive." Baby Boy Flute, who died four hours after birth, was a human being for the purpose of the statute. He is thus a victim within the scope of § 1112. No applicable exception for conduct of a mother that causes injuries sustained in utero and resulting in death after birth exists. Flute is thus an appropriate defendant within the scope of § 1112 and may be criminally charged for her conduct of abusing prescription and over-the-counter drugs, ultimately resulting in Baby Flute's death after birth. We therefore conclude that the district court erroneously dismissed the Indictment on the basis that the federal involuntary manslaughter statute does not extend to cover Flute's conduct. Because we conclude that the relevant statutes unambiguously encompass Flute and her conduct, we need not address her argument regarding the

---

[1]In the dissent's view, the common law understanding of manslaughter demands a different result. While the common law may inform the parameters of a federal offense, it may do so only to the extent that it comports with the federal statute. See United States v. Castleman, 572 U.S. 157, 163 (2014) ("[W]e recognized the general rule that 'a common-law term of art should be given its established common-law meaning,' except "'where that meaning does not fit.'" (quoting United States v. Johnson, 559 U.S. 133, 139 (2010)). The dissent's recitation of the meaning of common law manslaughter "does not fit" with the express definitions Congress provides. We thus rely only on the express statutory language.

rule of lenity. See Maracich v. Spears, 570 U.S. 48, 76 (2013). We also decline to address Flute's as-applied challenge, and we leave to the district court the task of deciding that issue in the first instance. See, e.g., Williams v. Target Stores, 479 F. App'x 26, 28 (8th Cir. 2012) (per curiam) ("That issue was not decided below, however, and is a matter best left to the district court to consider in the first instance on remand.").

III.

The district court erred in dismissing the Indictment; accordingly, we reverse and remand with instructions to reinstate the Indictment. On remand, the district court may take up Flute's as-applied due process challenge.

COLLOTON, Circuit Judge, dissenting.

The federal manslaughter statute was enacted in 1909. According to the United States Attorney, the government has never before charged a mother with manslaughter based on prenatal neglect that causes the death of a child. As the district court observed, accepting the government's view of the statute could have broad ramifications for the criminal liability of mothers based on their conduct while pregnant. Resolving this significant issue of first impression requires careful attention to the historical underpinnings of the manslaughter statute. While I do not agree with the district court's particular statutory analysis, I do conclude that Congress has not adopted a manslaughter statute that imposes criminal liability on a mother for prenatal conduct that results in the tragic death of her child. I would therefore affirm the order dismissing the indictment.

Manslaughter is a crime of long lineage. In the eighteenth century, Blackstone defined it as "the unlawful killing of another, without malice, either express or implied; which may be either voluntarily, upon a sudden heat; or involuntarily, but

in the commission of some unlawful act." 4 William Blackstone, *Commentaries* *191. Commission of an "unlawful act" included doing "an act, lawful in itself, but in an unlawful manner, and without due caution and circumspection." *Id.* at *192. In 1909, Congress amended the federal criminal code to include the current definition, which aligns with Blackstone's:

> Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:
>
> Voluntary – Upon a sudden quarrel or heat of passion.
>
> Involuntary – In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.

18 U.S.C. § 1112(a).[2]

"It is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses." *Sekhar v. United States*, 133 S. Ct. 2720, 2724 (2013) (internal quotation omitted). "Manslaughter" and its common-law definition are longstanding terms of art in the criminal law.

---

[2]As enacted in 1909, the words defining involuntary manslaughter appeared in a slightly different order: "In the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." Act of March 4, 1909, ch. 321, Pub. L. No. 60-350, § 274, 35 Stat. 1088, 1143. The phrase "of a lawful act which might produce death" was moved to the end of the sentence in 1948. *See* Act of June 25, 1948, ch. 645, § 1112(a), 62 Stat. 683, 756. A Reviser's Note to the 1948 version stated that "[m]inor changes were made in phraseology." 18 U.S.C. § 1112(a) reviser's note (Supp. III 1950).

-11-

> [W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.

*Morissette v. United States*, 342 U.S. 246, 263 (1952). We must *presume* that Congress intended to incorporate the common-law meaning of common-law terms that it employs, "unless the statute otherwise dictates." *Neder v. United States*, 527 U.S. 1, 23 (1999) (internal quotation omitted). In discerning the meaning of § 1112(a), then, it is appropriate to consider the common-law history of the manslaughter offense and its application to the circumstance of prenatal neglect by a mother that later results in the death of a child born alive.

The common law of England recognized that a *third party* could be guilty of homicide for causing prenatal injuries to a mother or unborn child that resulted in the subsequent death of a child born alive. The principal debate in that situation concerned whether it was feasible to prove that prenatal acts caused the death of a live-born child. Lord Coke suggested that

> [i]f a woman be quick with childe, and by a Potion or otherwise killeth it in her wombe; or if a man beat her, whereby the childe dieth in her body, and she is delivered of a dead childe, this is a great misprision, and no murder: but if the childe be born alive, and dieth of the Potion, battery, or other cause, this is murder: for in law it is accounted a reasonable creature, *in rerum natura*, when it is born alive.

3 Edward Coke, *Institutes of the Laws of England* 50 (London, M. Flesher 1644). Others such as Hale and Lambard, "impressed by the difficulty of proving that the death of a live-born child was occasioned by a defendant's prenatal acts, took a different view from Coke." D. Seaborne Davies, *Child-Killing in English Law*, 1

Modern L. Rev. 203, 209 (1937); *see* 1 Matthew Hale, *The History of the Pleas of the Crown* 433 (London, E. & R. Nutt and R. Gosling 1736); William Lambard, *Eirenarcha, or Of the Office of the Justices of Peace* 231 (London 1607 ed.) (1581). On the question whether proof of causation was legally possible, the law adopted Coke's position.

Thus, in cases involving prenatal acts of a third party that caused the death of a child born alive, the common law recognized a crime of murder or manslaughter. In *Rex v. Senior* (1832) 168 Eng. Rep. 1298; 1 Mood. C.C. 346, the court upheld a manslaughter conviction for a male midwife who negligently compressed the head of an infant in the act of birth, thereby causing the child's death after he was completely born alive. The court in *Regina v. West* (1848) 175 Eng. Rep. 329; 2 Car. & K. 784, similarly instructed a jury that a defendant would be guilty of the murder of a child carried by another if she, "by a felonious attempt to procure abortion, caused the child to be brought into the world, for which it was not then fitted, and that the child did die in consequence of its exposure to the external world." 175 Eng. Rep. at 330. Such decisions led the Ninth Circuit to conclude that "it was well-established in common law that murder was the killing of one human being by another, and that an infant born alive that later died as a result of fetal injuries was a human being." *United States v. Spencer*, 839 F.2d 1341, 1343 (9th Cir. 1988).

When it came to prosecutions of a mother, however, Coke's view did not prevail. The issue arose in two prominent cases under the law of England. In both decisions, courts ruled that a mother was not liable for manslaughter based on prenatal neglect that resulted in the death of a child born alive. *Regina v. Knights* (1860) 175 Eng. Rep. 952; 2 F. & F. 45, involved a mother who knew that she was about to give birth and wilfully abstained from taking the necessary precautions to preserve the life of the child after its birth. The prosecution urged that where the child died as a consequence of the alleged criminal neglect, the mother would be guilty of manslaughter. 175 Eng. Rep. at 953. The court, however, had "never heard

such a doctrine" and ruled that the mother could not be convicted of manslaughter. *Id.* The British Parliament in 1874 then considered proposals to provide for the punishment of a mother guilty of culpable prenatal neglect resulting in death, but no such provision was enacted. Davies, *supra*, at 210.

Thereafter, the decision in *Rex v. Izod* (1904) 20 Cox C.C. 690 (Eng.), reaffirmed the rule of *Knights*. The court rejected the prosecution's theory that "failure on the part of a woman to make proper provision for her expected confinement, resulting in the complete birth and subsequent death of a child, amounts to manslaughter." *Id.* at 691. To establish manslaughter by a mother, the court ruled, "neglect must be subsequent to the birth." *Id.* One leading treatise stated the common-law rule in the early twentieth century: "The mere failure on the part of a woman to make proper provision for her expected confinement, resulting in the complete birth and subsequent death of a child, is not sufficient in itself to warrant a conviction of manslaughter." 1 William Oldnall Russell, *A Treatise on Crimes and Misdemeanors* 675-76 (William Feilden Craies & Leonard William Kershaw eds., 7th ed. 1910).

The common law in early America was no different. A compilation of American and English cases through 1909 stated the law: "The wilful and negligent omission of a mother to care for herself or to make preparations for the birth of a child will not amount to manslaughter, although as a result of such neglect the child dies shortly after birth." 13 *The American and English Annotated Cases* 43 (William M. McKinley et al. eds., 1909). The few American cases on point followed the English common-law rule. In *Brown v. State*, 49 So. 146 (Miss. 1909), a woman gave birth in the toilet room of a train; the baby dropped to the ground through the stool and died after uttering a faint cry. The prosecution maintained that the mother was guilty of "such criminal negligence as to constitute manslaughter," but the Supreme Court of Mississippi ruled that the mother was not "guilty of any crime under the law." *Id.* at 147. As late as 1954, the Supreme Court of Wyoming addressed a

contention by the State that a mother was guilty of manslaughter for her failure, prior to the birth of a child, to provide medical care for an infant to be born. *State v. Osmus*, 276 P.2d 469, 474-75 (Wyo. 1954). The court reported that "*no case decided in this country* has been found going to the length of the contention of the state," and then applied the common-law rule of *Knights* and *Izod* that a mother is not guilty of manslaughter based on prenatal neglect causing the subsequent death of a child born alive. *Id.* at 475 (emphasis added).

The 1909 federal manslaughter statute is best understood as incorporating this common-law meaning. "Unlike the homicide statutes in some modern penal codes that specifically define each element of the various degrees of criminal homicide, the federal homicide statutes simply adopt the language of the traditional common-law offenses of murder and manslaughter." *United States v. Browner*, 889 F.2d 549, 551 (5th Cir. 1989) (citations omitted). The Ninth Circuit, in upholding the murder conviction of a man whose attack on a pregnant woman caused the subsequent death of a child born alive, relied on "Congress's intent to reflect the state and common-law definition of murder" when it passed the homicide statutes in 1909. *Spencer*, 839 F.2d at 1343. *Accord United States v. Serawop*, 410 F.3d 656, 666 (10th Cir. 2005) (concluding that the federal manslaughter statute should be read "in accordance . . . with the history of the common law"); *United States v. Sargent*, 18 M.J. 331, 336 (C.M.A. 1984) (explaining that the Manual for Courts-Martial adopted the federal statutory definition of manslaughter, which is "declaratory of the common law"). The limited legislative history of the provision, insofar as it should be considered, suggested no intent to expand the meaning to encompass a mother's prenatal acts: Manslaughter was "defined and classified in language similar to that to be found in the statutes of a large majority of the States." H.R. Rep. No. 2, 60th Cong., 1st Sess., at 24 (1908).

Later enactments did not change the meaning of manslaughter in § 1112(a). The Born-Alive Infants Protection Act, enacted in 2002, affirms that the term "human

being" in the manslaughter statute includes "every infant member of the species homo sapiens who is born alive at any stage of development." 1 U.S.C. § 8(a). The common law, however, already recognized that an infant born alive is a human being who could be the victim of manslaughter, yet the law did not make a mother guilty of manslaughter based on prenatal acts. The 2002 statute does not address a mother's liability under the manslaughter statute. The Unborn Victims of Violence Act of 2004, 18 U.S.C. § 1841, likewise does not broaden the manslaughter statute beyond its original meaning.

The majority responds that the common-law meaning of manslaughter "does not fit" with the federal manslaughter statute. *Ante*, at 9 n.1. Of course, "we do not assume that a statutory word is used as a term of art where that meaning does not fit," and we "do not force term-of-art definitions into contexts where they plainly do not fit and produce nonsense." *Johnson v. United States*, 559 U.S. 133, 139-40 (2010) (internal quotation omitted). So when Congress created the new statutory term "violent felony" and defined it to mean a crime with an element of using "physical force" against another person, the common-law meaning of "force" would have been a "comical misfit." *Id*. at 139. That was so because the common-law meaning of "force" encompassed "even the slightest offensive touching," which obviously was not "violent." *Id*. at 145. But here, Congress did not coin any new term; it simply criminalized the traditional offense of "manslaughter" and gave it the common-law definition that dates to Blackstone. In that situation, the statutory words and the common-law meaning fit hand in glove. This case no doubt depends on the "express statutory language," *ante*, at 9 n.1, but the question is what the language *means*. As a unanimous Supreme Court reaffirmed just last month, "[w]hen a statutory term is 'obviously transplanted from another legal source,' it 'brings the old soil with it.'" *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (quoting *Hall v. Hall*, 138 S. Ct. 1118, 1128 (2018) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947))).

In sum, the common-law meaning of manslaughter did not encompass prenatal neglect by a mother that later caused the death of her child born alive. Research reveals no decision in England or the United States before 1909 holding that a mother's prenatal neglect constituted manslaughter. Congress in 1909 adopted the common-law definition of manslaughter in § 1112(a); nothing in the statute dictates that its scope is broader than the common-law meaning. No federal statute enacted after 1909 has expanded the manslaughter statute to encompass a mother's prenatal neglect.

This case raises profound moral and policy questions, but it requires an Act of Congress to extend federal criminal liability to a mother whose drug use during pregnancy causes the death of her child. I conclude that under present law, the government's allegations against Samantha Flute do not state an offense, and the district court's order dismissing the indictment should be affirmed.

_____