# United States Court of Appeals
## For the Eighth Circuit

_____

## No. 22-1603

_____

Brandon Robert Peterson

*Plaintiff - Appellee*

v.

Commander Roger Heinen, in his individual capacity; Sergeant Brandon Olson, in his individual capacity; Sergeant Nicholas Klinkner, in his individual capacity; Sergeant Troy Jorgenson, in his individual capacity; Washington County, Minnesota

*Defendants - Appellants*

Sheriff Dan Starry

*Defendant*

John Warneke, Assistant Jail Administrator in his individual capacity; Officer Kcee Cahill, in his individual capacity; Sergeant Frank Capra, in his individual capacity

*Defendants - Appellants*

Officer Dan Rein, in his individual capacity

*Defendant*

Sgt. David Frantsi, in his individual capacity; Officer Jennifer Glassmaker, in her individual capacity; Corporal Rebecca Dyck, in her individual capacity; Nurse Melinda Leibel, "Mindy" in her individual capacity; Officer Chad Gaikowski, in his individual capacity

*Defendants - Appellants*

Officer John Roberto, in his individual capacity

*Defendant*

Officer Vince Scheele, in his individual capacity

*Defendant - Appellant*

Officer Garrett Kleinendorst, in his individual capacity

*Defendant*

Officer De La Rosa, in his individual capacity; Stephanie Kaphing, in her individual capacity

*Defendants - Appellants*

John Does, 1-10 in their individual capacities

*Defendant*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: December 15, 2022
Filed: December 26, 2023

_____

Before LOKEN, ERICKSON, and KOBES, Circuit Judges.

_____

-2-

KOBES, Circuit Judge.

Brandon Peterson sued Washington County Jail (WCJ) officials under 42 U.S.C. § 1983 alleging deprivations of his constitutional rights while incarcerated. He also brought claims under Minnesota law and *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The district court denied qualified immunity to multiple officials and deferred making a definitive summary judgment ruling on the state law and *Monell* claims. After careful review of the district court's order and the record, including the relevant video footage, we reverse in part, dismiss in part, and vacate in part. The case is remanded to the district court.

I.

Some orientation first. This interlocutory appeal involves 16 appellants and a hodgepodge of constitutional and state law claims.

The district court denied Sergeants Nicholas Klinkner, Brandon Olson, and David Frantsi as well as Officers De La Rosa, Rebecca Dyck, Kcee Cahill, Jennifer Glassmaker, and Vince Scheele qualified immunity for their alleged use of and failure to intervene in excessive force. It also denied Commander Roger Heinen and Nurses Stephanie Kaphing and Melinda Leibel qualified immunity for their alleged deliberate indifference to Peterson's serious medical needs, and it denied unknown defendants qualified immunity from Peterson's conditions-of-confinement claims. The court then deferred a definitive disposition of his state law and *Monell* claims for another day.

II. Section 1983 Claims

We first address the denial of qualified immunity. We review *de novo*, viewing the record in the light most favorable to Peterson and drawing all reasonable inferences in his favor. *See Thurmond v. Andrews*, 972 F.3d 1007, 1011 (8th Cir. 2020); *see also Jackson v. Gutzmer*, 866 F.3d 969, 975 (8th Cir. 2017) (discussing

our limited jurisdiction to review pretrial denial of qualified immunity).  We accept as true "the facts that the district court specifically found were adequately supported, along with those facts that the district court likely assumed."  *Roberts v. City of Omaha*, 723 F.3d 966, 972 (8th Cir. 2013) (citation omitted).  But where those facts are "blatantly contradicted by the record," say, in video recordings, we do not "adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 378–81, 384 (2007).

To decide whether the district court should have granted qualified immunity, we ask if the facts "demonstrate the deprivation of a constitutional or statutory right" and if "the right was clearly established at the time of the deprivation."  *Handt v. Lynch*, 681 F.3d 939, 943 (8th Cir. 2012).  We review each defendant's conduct individually.  *Wilson v. Northcutt*, 441 F.3d 586, 591 (8th Cir. 2006).[1]

### A. Excessive Force

Before addressing excessive force, we must pin down "the precise constitutional violation with which [the defendants are] charged."  *Baker v. McCollan*, 443 U.S. 137, 140 (1979).  The parties spar over whether the Eighth Amendment or the Fourteenth Amendment applies to Peterson's excessive force claims.  And understandably so:  if the Fourteenth Amendment applies, Peterson has "a lighter burden to show a constitutional violation."  *Smith v. Copeland*, 87 F.3d 265, 268 n.4 (8th Cir. 1996) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979)).

---

[1]At least three defendants have no basis for remaining in the case.  Sergeant Troy Jorgenson and Officer Chad Gaikowski are only listed in the caption of the district court's order, and the district court dismissed the only claim against Sergeant Frank Capra.  Peterson hasn't alleged any facts that tie these appellants to his live claims, so we reverse the district court's denial of summary judgment to these appellants.  As for Assistant Jail Administrator John Warneke, we vacate the district court's denial of summary judgment and remand with instructions to decide whether he is entitled to qualified immunity from Peterson's remaining claims.

The issue boils down to whether someone detained awaiting adjudication of a probation violation is more like a pretrial detainee or a convicted prisoner. Pretrial detainees seeking to vindicate their rights to be free from excessive force find shelter in the Fourteenth Amendment's Due Process Clause. *See Kingsley v. Hendrickson*, 576 U.S. 389, 396–99 (2015) (holding that a pretrial detainee alleging excessive force "must show only that the force purposely or knowingly used against him was objectively unreasonable"). Convicted prisoners seeking the same must turn to the Eighth Amendment's Cruel and Unusual Punishments Clause. *See Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992) (holding that a convicted prisoner must show that the force was applied "maliciously and sadistically to cause harm").

When Peterson first arrived at WCJ, he was being held on unadjudicated probation violation charges tied to a state conviction for disorderly conduct. He received 90 days in prison, with 60 days suspended, for that conviction, as well as one year of probation, revocable if Peterson "fail[ed] to abide by the rules." *See Morrissey v. Brewer*, 408 U.S. 471, 479 (1972). If Peterson violated any conditions of his probation, the sentencing order states that the court could order him to serve "the balance of the [original] sentence."

So while on probation and before being held at WCJ, Peterson was unlike "pretrial detainees or persons enjoying unrestricted liberty." *See Whitley v. Albers*, 475 U.S. 312, 327 (1986); *see also United States v. Haymond*, 139 S. Ct. 2369, 2380 n.5 (2019) (plurality opinion) (quoting *id.* at 2395 (Alito, J., dissenting)). Nevertheless, Peterson latches onto how, like criminal charges against pretrial detainees, his probation violation charge was "unadjudicated," so he says the Fourteenth Amendment applies. *See Bell*, 441 U.S. at 535–36.

We are unconvinced. While alleged probation violators are afforded certain protections under the Due Process Clause, *see Gagnon v. Scarpelli*, 411 U.S. 778, 782, 790 (1973) (probationer "entitled to a preliminary and a final revocation hearing" and, in some situations, counsel); *see also Douglas v. Buder*, 412 U.S. 430, 432 (1973) (per curiam), neither we nor the Supreme Court have afforded alleged

probation violators "a substantive 'liberty' interest" to be free from excessive force under the Fourteenth Amendment while detained, *see Kingsley*, 576 U.S. at 407 (Scalia, J., dissenting).[2] We decline "to expand the concept of substantive due process" unnecessarily, *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992), as the Eighth Amendment provides the "explicit textual source of constitutional protection" against excessive force applied to an individual incarcerated on an unadjudicated probation violation, *cf. Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

Unlike a pretrial detainee, Peterson finds himself outside any "stage of a criminal prosecution." *Gagnon*, 411 U.S. at 782. In other words, Peterson is "in wholly different circumstances" than those of a pretrial detainee, "separated by the harsh facts of criminal conviction," and held instead incident to the state's ongoing punishment following adjudication of his criminal culpability. *Cf. Ingraham v. Wright*, 430 U.S. 651, 669 (1977); *Meachum v. Fano*, 427 U.S. 215, 225 (1976) ("Confinement in any of the State's institutions is within the normal limits or range of custody which the conviction has authorized the State to impose."); *see also United States v. Makeeff*, 820 F.3d 995, 1000 (8th Cir. 2016) ("Probation, like incarceration, is a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty." (citation omitted)). His detention is part and parcel of the state's successful criminal conviction and ensuing punishment, *see Bell*, 441 U.S. at 537 n.16, where any alleged excessive force claim incurred during consequent incarceration is analyzed under the Eighth Amendment, *Hudson*, 503 U.S. at 6–7.

---

[2]We have previously treated detainees like Peterson as pretrial detainees where the Eighth Amendment and Fourteenth Amendment analyses were identical. *See A.H. v. St. Louis Cnty.*, 891 F.3d 721, 724, 726 (8th Cir. 2018) (deliberate indifference claim); *see also Crow v. Montgomery*, 403 F.3d 598, 600–01 (8th Cir. 2005) (conditions-of-confinement claim). Because we did not squarely address the issue, these decisions are not controlling here. *Passmore v. Astrue*, 533 F.3d 658, 660 (8th Cir. 2008).

We turn now to Peterson's allegations of excessive force in the context of the Eighth Amendment. Here, "only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment." *Whitley*, 475 U.S. at 319 (cleaned up) (citation omitted). "The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Id.*

Our "core judicial inquiry" is whether the accused officers applied force "in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7. We are guided by "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Id.* (citation omitted).

Peterson's excessive force claims are confined to six incidents occurring between February and May 2018. We address each in turn.

## 1. February 19

Peterson alleges that on February 19, Sergeant Klinkner and Officers Dyck, Cahill, Glassmaker, and De La Rosa used excessive force while removing him from his cell. The district court held that a reasonable juror could find that they acted maliciously and not in a good-faith effort to maintain or restore discipline. We disagree.

Problems started when Peterson covered his cell's security camera, hurled a plastic cup to dislodge the covering, and missing his mark, hit a sprinkler head. The sprinkler burst, flooding Peterson's cell and requiring WCJ officials to relocate inmates and clean up.

Time came to relocate Peterson. As captured on video, Sergeant Klinkner and company ordered Peterson to crawl out of his cell. Peterson complied, and Officer Cahill held him down with a body shield for around 20 seconds while Officers Glassmaker, Dyck, and De La Rosa handcuffed him. When asked if he had anything on him that could hurt the officers or himself, Peterson responded that he could kill them all and that the officers should worry about him. Peterson continued to argue with and threaten the officers, taunting them and saying that he could get out of the cuffs if he wanted. Peterson then resisted as the officers tried to fasten him into a restraint chair. When he yelled profanities and spit at Sergeant Klinkner, the sergeant immediately shot chemical spray in Peterson's face.

Peterson analogizes Officers Cahill, Glassmaker, Dyck, and De La Rosa's restraint to the prison guards' force in *Edwards v. Byrd*, 750 F.3d 728 (8th Cir. 2014). There, we found a plausible Eighth Amendment excessive force claim where the guards tossed "a flash-bang grenade in close quarters, kicked the compliant detainees, and shot them with bean-bag guns." *Id.* at 732. Because the detainees "did not resist or otherwise act aggressively," the facts could "show that the guards did not apply this force in order to restore order or discipline but rather for the sole— and impermissible—purpose of inflicting unjustified harm on the detainees." *Id.*

February 19 was different. Peterson jeopardized prison security and order when he covered the security camera and flooded his cell. Once he crawled out, he resisted and threatened to kill the officers. Based on this, the officers were justified in holding Peterson down for a short time and using force to secure and restrain him in the chair. *Cf. Hickey v. Reeder*, 12 F.3d 754, 759 (8th Cir. 1993) ("[S]ummary applications of force are constitutionally permissible when prison security and order, or the safety of other inmates or officers, has been placed in jeopardy.").

Sergeant Klinkner's use of chemical spray on Peterson wasn't excessive force either. *See Jones v. Shields*, 207 F.3d 491, 496 (8th Cir. 2000) (holding that "a limited application of [chemical spray] to control a recalcitrant inmate constitutes a tempered response by prison officials when compared to other forms of force"

(cleaned up) (citation omitted)). Peterson points to *Treats v. Morgan*, where we recognized a basis for an Eighth Amendment excessive force claim after a correctional "officer use[d] pepper spray without warning on an inmate who may have questioned his actions but who otherwise pose[d] no threat." 308 F.3d 868, 873 (8th Cir. 2002). Importantly, the inmate "did not intentionally disobey [the correctional officer], use profanity or abusive language, or threaten any correctional officer." *Id.* at 872. We can't say the same about Peterson. Video footage clearly shows a recalcitrant Peterson cursing, threatening, and spitting at officers.

Sergeant Klinkner and Officers Dyck, Cahill, Glassmaker, and De La Rosa are entitled to qualified immunity for February 19.

## 2. February 23

Peterson alleges that on February 23, Officer Scheele used excessive force by spraying him twice with chemical spray. The district court held that a reasonable juror could find that Officer Scheele used force maliciously and not in a good-faith effort to maintain or restore discipline. Again, we disagree.

Although we don't have video, Peterson was yet again causing trouble in his cell by starting to pull a brick from his cell wall. Officer Scheele ordered him to stop. When Peterson refused, Officer Scheele delivered a short burst of chemical spray. Though Peterson surrendered the brick, he would not part with a metal bar he obtained from the floor grate of his cell, telling Officer Scheele that he would have to come and get it. Then, he slugged the glass window of his cell. After Officer Scheele ran to get a stronger chemical spray, he again asked Peterson to surrender his weapon. Peterson refused, and Officer Scheele delivered another short burst of chemical spray. Peterson finally gave up the metal bar and allowed WCJ officers to handcuff and remove him from his cell.

Peterson claims that Officer Scheele could not reasonably believe that he posed an immediate safety threat because he was locked in his cell. Instead, he says,

he was just "slowly complying" before Officer Scheele used force. We don't think so. In *Burns v. Eaton*, we rejected the argument that the inmate "posed no threat because he was alone in a locked cell" because it "ignore[d] the reality of what was required 'to maintain or restore discipline'" at the prison. 752 F.3d 1136, 1139 (8th Cir. 2014). Here, as in *Burns*, "[a]fter each aggressive act of defiance, [Officer Scheele] deployed a small amount of [chemical] spray." *Id.* at 1140.

In other words, this incident does not involve "a complete absence of a penological purpose," which could raise "the reasonable inference that [Officer Scheele] acted maliciously in an effort to cause harm." *Williams v. Jackson*, 600 F.3d 1007, 1014 (8th Cir. 2010); *see also Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008) (noting that "guards are liable only if they are *completely unjustified* in using force" (emphasis added)). Instead, Peterson was a demonstrably violent inmate who twice refused to surrender weapons he got by damaging WCJ property. Officer Scheele is thus entitled to qualified immunity for February 23.

### 3. February 25

Peterson alleges that on February 25, Officer Cahill and Sergeant Olson used excessive force—again by spraying him with chemicals. The district court held that a reasonable juror could find that the officers used force maliciously and not in a good-faith effort to maintain or restore discipline. We again disagree.

This unfolded on video. Officers initially saw several small, pill-sized white objects on Peterson's bed. Peterson then looked out his cell window and grabbed something from under his mattress. He again peered through the window before putting his hands to his mouth. A few minutes later, he collected a few of the white objects and, after glancing at the security camera, grabbed something from or put something under the mattress, and laid down.

Concerned that Peterson may have swallowed and was hoarding pills, Officer Cahill and Sergeant Olson repeatedly ordered him to "cuff up." Peterson refused,

-10-

groaning a few times, and said he was sleeping. Lying face down with a blanket over his head, Peterson's hand drifted underneath his mattress and then darted to his mouth. Officer Cahill told him "no" and warned Peterson that if he did not comply, he would be sprayed. Peterson, yelling and arguing with the officers, appeared to fidget with something underneath the blanket. With Peterson still noncompliant, Officer Cahill delivered a short burst of chemical spray inside the cell.

Viewing the facts in the light most favorable to Peterson, a reasonable juror could not find that Officer Cahill and Sergeant Olson used excessive force when they escalated the discipline from "cuff up" to chemical spray. Peterson's recalcitrance, even after being warned that he would be sprayed, combined with his highly furtive and potentially dangerous behavior, warranted discipline. *Cf. Jackson*, 866 F.3d at 977. And while the short burst of chemical spray inside Peterson's cell was no doubt "uncomfortable and unpleasant," we cannot say it was, under these circumstances, "repugnant to the conscience of mankind." *Id.* at 977–78 (quoting *Hudson*, 503 U.S. at 10); *see also Jones*, 207 F.3d at 497. Officer Cahill and Sergeant Olson are entitled to qualified immunity for February 25.

### 4. March 24

Peterson alleges that Officer Cahill and Sergeant Olson used excessive force on March 24 when they chemically sprayed him and shot him with an FN-303.[3] The district court concluded that a reasonable juror could find that they used force "out of malice or frustration." But the record—namely, videos—clearly shows otherwise.

This time Peterson was "kicking, angry, yelling, attempting to rip his mattress, and generally causing a disturbance." Carrying video cameras, Officer Cahill and Sergeant Olson approached Peterson's cell as he was screaming racial slurs at the

---

[3]An FN-303 looks like a rifle and uses compressed air to fire plastic projectiles.

inmate next door. Sergeant Olson held a can of chemical spray and said, "Peterson, we don't want to do this. You can't be disruptive." Peterson replied, "Well then don't. Get [the inmate next door] out of here." Sergeant Olson reached to open the tray pass in the cell door when Peterson said, "Go ahead, motherfucker, open it." Sergeant Olson opened the tray, and Peterson yelled, "Bitch, I'mma kill ya," as Sergeant Olson sprayed. Peterson continued to shout at his neighbor, threatening to stab him and Sergeant Olson.

With Peterson undeterred, the officers returned to his cell with an FN-303 and again carried video cameras. The officers noticed what appeared to be a sharpened toothbrush on Peterson's wet cell floor. Sergeant Olson ordered Peterson to pass his belongings through the tray pass. Officer Cahill, meanwhile, aimed the FN-303 through the opening. As another officer ordered Peterson to comply and Peterson continued to argue, Sergeant Olson can be heard saying, "Shoot him, shoot him." But Officer Cahill refused to shoot. Peterson began to comply, passing one of his belongings through the tray pass as he yelled and cursed. The officers told him, "Keep going; hurry up."

Peterson then grabbed his mattress and pinned it against his cell door, yelling, "Go fuck yourself. . . . I ain't playing your games." With a clear shot, Officer Cahill fired the FN-303 twice. Peterson again pinned the mattress against his cell door and shouted more expletives. The officers were able to open the cell door just enough to remove the mattress before again asking Peterson to pass his things through the tray pass. Instead, he went to his bed and said, "Fuck you, I'm just going to sit here." The officers then told him to "cuff up." Peterson did not. Officer Cahill shot him twice more in the legs, and Peterson finally relented.

The videos show that Peterson repeatedly refused to follow the officers' instructions and continued to disrupt order at WCJ. At no point before being chemically sprayed or shot with the FN-303 did Peterson "remov[e] any threat or need for force." *Walker v. Bowersox*, 526 F.3d 1186, 1188 (8th Cir. 2008). Nor did

the officers apply "an excessive [or] disproportionate use of force" relative to Peterson's dangerous behavior. *Cf. id.* at 1188–89.

Officer Cahill and Sergeant Olson delivered "a limited application of [chemical spray] to control a recalcitrant inmate," which "constitute[d] a 'tempered response by prison officials' when compared to other forms of force." *Jones*, 207 F.3d at 496 (citation omitted). And Officer Cahill fired the FN-303 only after the chemical spray failed to temper Peterson's disruption and after his noncompliance was obvious. He faced a "fast-moving and volatile situation," where Peterson had what appeared to be a sharpened toothbrush, continued to threaten the officers, and attempted to barricade himself in his cell. *Cf. Leonard v. St. Charles Cnty. Police Dep't*, 59 F.4th 355, 360 (8th Cir. 2023); *see also Hudson*, 503 U.S. at 7.

We have said that "[a]mong the most important" factors we consider when weighing whether to afford jailers qualified immunity in an excessive force case is whether the inmate "was actively resisting the extraction procedure." *Ryan v. Armstrong*, 850 F.3d 419, 428 (8th Cir. 2017). We have little difficulty concluding that Officer Cahill and Sergeant Olson's actions were not excessive, so both are entitled to qualified immunity for March 24.

### 5. May 1

Peterson also alleges that Officer Cahill and Sergeant Olson used excessive force when they sprayed him with chemical spray on May 1.[4] The district court concluded that a reasonable juror could find that they used force "out of malice or frustration." We continue to disagree.

Following what has now become a pattern, Peterson decided to cause trouble in his cell. This time, he covered his cell's security camera in the middle of the

---

[4]We do not have the benefit of video for May 1, so we rely on the district court's facts.

-13-

night. When the officers asked him to remove it, Peterson responded, "I'm sleeping." Officer Cahill told Peterson that "it would just take a second" and that otherwise they'd need to conduct a cell extraction. When he still did not remove the covering, one of the officers deployed chemical spray.

While in this case Peterson may not have been an immediate threat to himself or others, he was an immediate threat to WCJ security and order. *See Hickey*, 12 F.3d at 759. Covering a security camera immediately threatens jail security. *Cf. Smith v. Conway Cnty.*, 759 F.3d 853, 860–61 (8th Cir. 2014) (finding submissible case of excessive force where "[n]o 'security concern' or disciplinary necessity [was] apparent"). Peterson had a history of procuring weapons and was suspected of hoarding pills, and WCJ officials knew what he was capable of when unobserved. We have never said that jailers cannot use summary force when a recalcitrant and dangerous inmate's behavior implicates prison security concerns. *See Hickey*, 12 F.3d at 759; *Treats*, 308 F.3d at 872–73.

What we have said is that "[i]f the evidence shows only 'a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives[,] . . . the case should not go to the jury.'" *Jackson*, 866 F.3d at 975 (quoting *Whitley*, 475 U.S. at 322). Because he was not given a genuine opportunity to remove the covering from the security camera and the officers could see inside his cell, Peterson says, they should not have used force. But even if Officer Cahill and Sergeant Olson "arguably erred" when they decided to act, this "falls far short of a showing that there was no plausible basis for [their] belief that this degree of force was necessary." *Whitley*, 475 U.S. at 323. Accordingly, both are entitled to qualified immunity for May 1.

6. May 19

Finally, Peterson alleges that on May 19, Sergeant Olson used excessive force by deploying chemical spray. To justify his use of chemical spray, Sergeant Olson claims that Peterson "refused to comply with orders to turn over items from his cell."

-14-

Peterson says he was complying—albeit slowly. The district court found that Peterson's compliance was a genuine issue of material fact that precluded summary judgment. Because the May 19 video footage does not clearly refute this finding, we dismiss this part of the appeal for lack of jurisdiction. *Taylor v. St. Louis Cmty. Coll.*, 2 F.4th 1124, 1127 (8th Cir. 2021).

## B. Failure to Intervene

Peterson alleges that Sergeants Klinkner and Frantsi and Officers Cahill, Glassmaker, Dyck, and De La Rosa face liability for failure to intervene in the uses of excessive force on February 19, February 23, February 25, March 24, and May 1. *See Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir. 1981). But we have reversed the district court's denial of summary judgment for these dates. Without an underlying constitutional violation, there can be no liability for failure to intervene. *See Smith*, 759 F.3d at 861. And though we dismissed the appeal with respect to the May 19 incident, Peterson does not allege that any particular defendant failed to intervene in Sergeant Olson's use of force on that date. So we reverse the district court's denial of summary judgment on all of Peterson's failure to intervene claims.

## C. Deliberate Indifference

Next, Peterson argues that Commander Heinen and Nurses Leibel and Kaphing unconstitutionally delayed responding to his mental health condition, making it worse. The district court held that a reasonable juror could find that they deliberately disregarded Peterson's serious mental illness in violation of the Eighth Amendment. Because the facts, even when viewed in the light most favorable to Peterson, do not support the violation of a clearly established right, we reverse.

Whether these WCJ officials acted with "deliberate indifference" requires both an objective and a subjective analysis. *Saylor v. Nebraska*, 812 F.3d 637, 644 (8th Cir. 2016). Objectively, Peterson must establish that he suffered from a serious medical need. *Id.* Subjectively, Peterson must show that these defendants "actually

knew of but deliberately disregarded his serious medical need." *Scott v. Benson*, 742 F.3d 335, 340 (8th Cir. 2014). This demands a mental state of more than gross negligence and "akin to criminal recklessness." *Saylor*, 812 F.3d at 644 (citation omitted).

The district court concluded that Peterson suffers from an objectively serious medical need related to his bipolar disorder, a ruling we do not disturb on appeal. Rather, we focus on the subjective analysis and ask whether the allegedly "violative nature of [Commander Heinen and Nurses Kaphing and Leibel's] *particular* conduct is clearly established." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (citation omitted). "For a right to be 'clearly established,' the law must have been sufficiently clear, at the time of the official's conduct, to put every reasonable official on notice that what he was doing violated that right." *Hamner v. Burls*, 937 F.3d 1171, 1177 (8th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). A plaintiff needs no "case directly on point"; rather, he needs "controlling authority" or "a robust 'consensus of cases of persuasive authority'" that puts "the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741–42.

The facts distinguish the alleged deprivation of Peterson's rights from the violations recognized in our previous decisions. To begin, Peterson says that *Gordon ex rel. Gordon v. Frank* clearly established that officials violate the Eighth Amendment when they "delay medical treatment for an inmate with obvious signs of medical distress, especially one who communicates this distress directly to officers." 454 F.3d 858, 862–63 (8th Cir. 2006). But the facts in *Gordon* were very different: the jailers disregarded an inmate's "high risk of heart failure" and forced him to climb stairs on his own despite knowing he was on medical observation. *Id.* at 861–63. And they repeatedly ignored the inmate's complaints of chest pain and breathing troubles before he succumbed to heart disease. *Id.*; *see also Ryan*, 850 F.3d at 426 (evidence of prison officials' complete failure to "talk with [an inmate] or seek medical treatment" or to see a "pool of blood" after the inmate "bang[ed] his head [and screamed] throughout the night" precluded summary judgment).

Peterson did not suffer from the same medical apathy. The record shows that Nurse Kaphing noted Peterson's struggles with mental health during an intake evaluation; that Nurse Leibel conducted a mental health assessment; that Peterson was repeatedly prescribed medications for his mental health (though he often refused to take them); and that the jail's qualified mental health provider, or "QMHP," conducted a psychiatric diagnostic evaluation and scheduled a follow-up visit. Plus, Commander Heinen inquired about civil commitment shortly after the sprinkler-head incident and decided to send Peterson to Regions Hospital for a crisis evaluation. In other words, "the prison officials at least attempted to fix the problems that did arise." *Hamner*, 937 F.3d at 1178. And to the extent Peterson alleges that he should have seen a QMHP sooner, we have said that "inmates have no constitutional right to receive a particular or requested course of treatment." *Dulany v. Carnaham*, 132 F.3d 1234, 1239 (8th Cir. 1997).

Likewise, Peterson's reliance on *Buckley v. Rogerson* is misplaced, as the constitutional violation alleged there involved "specific medical approval of segregation and restraint for prison mental patients" housed at a prison psychiatric hospital. 133 F.3d 1125, 1127, 1129 (8th Cir. 1998). While Peterson alleges that Commander Heinen unconstitutionally imposed disciplinary plans without consulting a QMHP, the unconstitutional "treatment plans" at issue in *Buckley*—which correctional officers with no medical training implemented—were "designed to address [the inmate's] mental illness." *Id.* at 1127. Here, the disciplinary plans were designed to address, as the district court found, Peterson's "challenging or disruptive behavior" at WCJ.

Finally, citing *McRaven v. Sanders*, 577 F.3d 974, 981 (8th Cir. 2009), Peterson claims that Commander Heinen and Nurses Kaphing and Leibel unreasonably relied on an unfounded decision by Regions Hospital medical staff to return Peterson to WCJ after his crisis evaluation. He says Nurse Leibel improperly opposed his transfer to Regions Hospital and withheld information about his condition, hindering the medical staff's evaluation. But *McRaven* involved officials who refused to correct an attending nurse's assumption that the inmate's symptoms

-17-

of extreme intoxication were due to "the influence of alcohol, not drugs." *Id.* at 981–82. Medical staff at Regions Hospital had no such dearth of information. The hospital record Peterson relies on in faulting Nurse Leibel said that Peterson irregularly took and once snorted his medications, that Peterson's medication was discontinued after the snorting incident, and that he was "manic for two weeks" and "ruined [two] jail cells by throwing items and breaking mirrors, and throwing feces."

All told, neither *Gordon* nor *Buckley* nor *McRaven* shows that Commander Heinen's, Nurse Leibel's, or Nurse Kaphing's particular conduct violates the Eighth Amendment, so we reverse the district court's denial of qualified immunity.

## D. Conditions of Confinement

Peterson also alleges that unknown officials violated the Eighth Amendment by subjecting him to unconstitutional conditions of confinement. Qualified immunity is "immunity from suit rather than a mere defense to liability," and it "is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis omitted). The district court did not conduct a thorough qualified immunity analysis, so we remand for it to address the issue. *See, e.g.*, *O'Neil v. City of Iowa*, 496 F.3d 915, 917–18 (8th Cir. 2007); *Handt*, 681 F.3d at 943–45.

## II. State Law and *Monell* Claims

Appellants urge us to address official immunity from Peterson's state law claims. *See Birkeland ex rel. Birkeland v. Jorgensen*, 971 F.3d 787, 791 (8th Cir. 2020) (noting that "because official immunity under Minnesota law provides immunity from suit, we have jurisdiction to review issues of law related to the denial of official immunity"). Because the district court did not reach these issues, we remand so it can do so first. *See United States v. Flute*, 929 F.3d 584, 590 (8th Cir. 2019); *Sletten v. Ramsey Cnty.*, 675 N.W.2d 291, 299 (Minn. 2004) (en banc) (noting

that official immunity "is effectively lost if the case is erroneously permitted to go to trial").

Washington County also urges us to address whether it faces *Monell* liability. To exercise our pendent jurisdiction over this part of the appeal, the *Monell* issues must be "'inextricably intertwined' with the qualified immunity analysis." *Roberts*, 723 F.3d at 975 (citation omitted). "An issue is inextricably intertwined with properly presented issues only when the appellate resolution of the collateral appeal necessarily resolves the pendent claims as well." *Id.* (citation omitted). Because we remand and dismiss certain claims, we cannot resolve on appeal whether Washington County may be liable under *Monell*.

## III. Conclusion

We reverse the district court's denial of summary judgment to Sergeants Jorgenson and Capra and Officer Gaikowski. We also reverse on Peterson's excessive force claims arising out of the February 19, February 23, February 25, March 24, and May 1 incidents. And we dismiss the appeal as to the May 19 incident. Finally, we reverse the denial of summary judgment on Peterson's failure to intervene and deliberate indifference claims and vacate the denial of summary judgment on Peterson's conditions of confinement, state law, and *Monell* claims. The case is remanded for proceedings consistent with this opinion.

_____