United States Court of Appeals
For the Eighth Circuit
No. 16-2184

Ronnie Jackson

*Plaintiff - Appellee*

v.

Jeff Gutzmer

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: March 9, 2017
Filed: August 10, 2017

_____

Before LOKEN, MURPHY, and BENTON, Circuit Judges.

_____

LOKEN, Circuit Judge.

After a disturbance resulted in Minnesota inmate Ronnie Jackson spending three-and-one-half hours on a restraint board, Jackson filed this 42 U.S.C. § 1983 action against correctional officers and medical staff of the Oak Park Heights maximum security prison. Defendants moved for summary judgment, and the district court dismissed all claims except an Eighth Amendment excessive force claim against

Lieutenant Jeff Gutzmer, who authorized use of the restraint board. Gutzmer appeals the denial of summary judgment based on qualified immunity. Reviewing that issue *de novo* and the facts in the light most favorable to Jackson, we reverse. See Burns v. Eaton, 752 F.3d 1136, 1138 (8th Cir. 2014).

## I.

**A.** Convicted of arson, Jackson was admitted to the Minnesota Correctional Facility in St. Cloud in November 2012. An initial psychiatric assessment reflected his self-reported history of 28 suicide attempts, suicidal thoughts, hearing voices to harm himself and others, cutting himself, depression, and anxiety. The assessment also related violent episodes including stabbing his school principal with scissors and striking his fiancé with a bottle. The examining doctor diagnosed Jackson with depression, borderline personality disorder with possible dissociative episodes, and alcohol dependency.

During Jackson's first week at the St. Cloud facility, he violated multiple rules, including threatening others, possessing a weapon, and assaulting correctional staff. The weapon possession violation was a major infraction. Jackson also reported that voices were telling him to slit his cellmate's throat. The Minnesota Department of Corrections (DOC) transferred Jackson to the Oak Park Heights maximum security facility, placed him on disciplinary segregation status, and assigned him to the Administrative Control Unit (ACU). Designed to protect inmates from themselves and others and to maintain orderly prison operations, the ACU is the most secure prison living unit in Minnesota. ACU inmates are confined to their cells for twenty-three hours per day and allowed only limited personal property. To receive medical attention, an ACU inmate can submit a written "kite" for a medical visit; for emergency life-threatening situations, an inmate can press a duress button in his cell.

While at Oak Park Heights, Jackson was sent repeatedly to ACU or to Complex 5, a segregation unit for less threatening inmates or those with shorter segregation sentences. He was convicted of more than twenty rule violations, including assaulting staff, disorderly conduct, threatening behavior, disobeying direct orders, abuse or harassment, and destruction of prison property. In one incident, Jackson refused to return to his cell, kicked a responding officer in the thigh, and threatened that "whoever put hands on me is going to die."

In a November 2013 incident, after scheduling a medical visit for neck pain, Jackson told a correctional officer that he had swallowed a razor blade, triggering an Incident Command System (ICS) call for a self-injurious inmate. A doctor responded and evaluated Jackson's complaint of chest, arm, and neck pain. He was then placed in a Complex 5 cell. A few hours later, he covered his cell camera with plastic lining from his mattress, refused directives to come to the door to be placed in restraints, and stated he was going to "get to ACU by doing whatever it takes." The next day, while staff removed the mattress, Jackson spat in the eye of a correctional officer. For these violations, Jackson was placed in the ACU for 540 days of segregation and given 180 days of extended incarceration. Jackson resided in the ACU until April 2014, when ACU inmates were moved to Complex 5 because of ACU construction.

**B.** The events giving rise to this lawsuit occurred on May 13, 2014. We relate facts stated in Jackson's Declaration In Opposition to Defendants' Motion For Summary Judgment. Around 7:20 a.m. that morning, Jackson declared, he informed a non-defendant correctional officer he was not feeling well, but it was not serious enough for medical attention. By noon, he was experiencing severe chest pains, nausea, shortness of breath, and vomiting, side effects he attributed to a depression medication, Effexor. Over the next hour and a half, Jackson tried to get medical attention by notifying a nurse and a correctional officer and by pushing his emergency duress button at three different times. At 1:38 p.m., thinking his medical situation

-3-

was "dire," Jackson grabbed a "grease container" in his cell and began to knock on the door to alert staff of his medical needs. Then, Jackson declared:

> For several minutes I was knocking on my door with the grease container, [and] at approximately 1:40 p.m. my neighbors . . . began asking me what was going on and why I was knocking on my door. My neighbors (I believe) had been hearing me ask for medical assistance. I explain to them the situation and tell them I need 'help' and they began hitting their doors trying to get the attention of the staff.

> For approximately 5 minutes staff completely ignore the noise . . . [until defendant Sergeant Donn] Weber finally heads towards [my cell] and all inmates stop hitting their doors. . . . Weber walks directly to my door, I attempt to stand and speak with him but my chest contracts painfully hard and I cry out in pain, and in my weakened state, slide down the inside of my door . . . . I see [Sergeant] Weber . . . activating an ICS response . . . for a self-injurious inmate. I was not hurting myself.[1]

Lieutenant Gutzmer, responsible for supervising the ACU until 3:00 p.m. that day, responded to Weber's ICS call for a self-injurious inmate. Though it is disputed whether Gutzmer witnessed Jackson kicking and punching the cell door after Gutzmer arrived, it is undisputed that Sgt. Weber told Gutzmer that Jackson had been

---

[1]Sergeant Weber's contemporaneous incident report partially contradicted Jackson's Declaration. According to Sergeant Weber, he "could see that inmate Jackson . . . was in his cell, pounding/kicking his door and that he was the source of the disturbance. The door of [Jackson's cell] was shaking and rattling and inmate Jackson was out of control, screaming and yelling incoherently, as he punched and/or kicked the cell door." However, after activating ICS and attempting to calm Jackson, Sergeant Weber concluded that "Inmate Jackson was NOT 'out of control' but rather appeared to be in total control of his actions and emotions. Inmate Jackson fully admitted that he was only causing the disturbance in an attempt to manipulate health services staff into visiting him at his cell."

-4-

kicking and punching his cell door and ignored directives to stop. In Gutzmer's experience, he had seen inmates break their wrist, feet, or hands by kicking or punching a cell door. Gutzmer averred that he feared Jackson may continue to engage in self-injurious behavior if not restrained. So Gutzmer "decided to err on the side of safety" and authorized the use of the restraint board.

**C.** After Gutzmer decided Jackson should be placed on the restraint board, the officers complied with DOC policies for "pinion restraints." Jackson was cuffed, placed in leg restraints, and escorted by multiple correctional officers to a table outside his cell, where he was seen by two nurses. Jackson complained to the nurses of chest pains. The nurses determined that his vital signs, blood pressure, respiration, and pulse were normal, and his skin was warm and dry; he could talk normally and did not appear to be in distress or suffering from any medical need requiring immediate treatment or attention. The nurses medically cleared Jackson to be placed on the restraint board. Consistent with policy, Jackson's extraction from his cell and placement on the restraint board were videotaped. The handcuffed and shackled Jackson appears subdued and complies with officer instructions. The video confirms the prior medical clearance and shows him being safely placed face down on the restraint board at approximately 2:00 p.m., with a towel under his head and restraint straps across his legs, back, and head. A nurse made sure the restraints were not too tight, and an officer informed Jackson that he may request to use a bathroom "in a manner that maintains the safety of the staff and the offender."

Jackson was taken to a different cell while on the restraint board. A mental health professional evaluated him, officers checked on him every fifteen minutes using a camera in the cell, and an officer and a nurse checked on him in person every thirty minutes to examine his blood circulation and to determine whether he would comply with staff directives and could be unrestrained. Jackson repeatedly yelled and removed his head restraint. After a non-defendant correctional officer told Jackson he could not use the bathroom, Jackson urinated on himself at approximately 4:25

p.m. Gutzmer's shift ended at 3:00 p.m., and Gutzmer did not see Jackson after he was placed on the restraint board. Lieutenant Jeffrey White, Oak Park Heights Watch Commander from 2:30 p.m. to 10:30 p.m., received reports that Jackson had demonstrated he would cooperate with staff directives. Lt. White authorized Jackson's removal from the board at 5:25 p.m.

## II.

Paragraph 62 of Jackson's lengthy *pro se* complaint alleged that Lt. Gutzmer's actions "in authorizing the use of force and pinion restraints without need or provocation were done maliciously and sadistically and . . . constituted . . . cruel and unusual punishment in violation of" the Eighth Amendment. "An officer may be held liable only for his or her own use of excessive force." Smith v. City of Minneapolis, 754 F.3d 541, 547-48 (8th Cir. 2014) (quotation omitted). As Jackson does not allege that the ICS officers used excessive force in removing him from his cell to the table where the nurses examined him, the only issue on appeal is whether Lt. Gutzmer used or authorized the use of excessive force in placing Jackson on the restraint board.

"After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Whitley v. Albers, 475 U.S. 312, 319 (1986) (quotation omitted). What constitutes the "unnecessary and wanton infliction of pain" varies based on the alleged constitutional violation. "[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishment Clause, the core judicial inquiry is that set out in Whitley: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992); see Wilkins v. Gaddy, 559 U.S. 34, 37 (2010). This inquiry turns on "such factors as the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of injury inflicted," from which "inferences may be drawn

as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." Whitley, 475 U.S. at 321. The word "sadistically" is not surplusage; "'maliciously' and 'sadistically' have different meanings, and the two together establish a higher level of intent than would either alone." Howard v. Barnett, 21 F.3d 868, 872 (8th Cir. 1994).

This is a highly deferential standard. "It does not insulate from review actions taken in bad faith and for no legitimate purpose, but it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice." Whitley, 475 U.S. at 322. "[P]rison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Hudson, 503 U.S. at 6 (quotation and alteration omitted). Evidence "that prison officials arguably erred in judgment" in deciding to use even deadly force "falls far short of a showing that there was no plausible basis for [their] belief that this degree of force was necessary." Whitley, 475 U.S. at 323. If the evidence shows only "a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives . . . the case should not go to the jury." Id. at 322.

This is an interlocutory appeal from the denial of qualified immunity, a doctrine that "shields a government official from liability unless his conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Burns, 752 F.3d at 1139, quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). Because it protects officials from the burden of defending insubstantial claims, as well as from damage liability, the Supreme Court has "stressed the

importance of resolving immunity questions at the earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. 223, 232 (2009) (quotation omitted).

The pretrial denial of qualified immunity is an appealable final order to the extent it turns on an issue of law. See Mitchell v. Forsyth, 472 U.S. 511, 530 (1985). We have no jurisdiction to review a district court's interlocutory summary judgment order that "determines only a question of 'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial." Johnson v. Jones, 515 U.S. 304, 313 (1995). Jackson argues we lack jurisdiction over this appeal for two reasons: first, because there is a genuine fact dispute whether Jackson was placed on the restraint board because he was self-injurious, as Weber and Gutzmer claim, or "as wanton punishment for calling attention to his medical condition," as Jackson claims; and second, because issues "related to Gutzmer's intent preclude interlocutory review."

The second reason requires only brief discussion because it is contrary to controlling authority. In Crawford-El v. Britton, 523 U.S. 574, 588-89 (1998), the Supreme Court acknowledged the inherent difficulty of applying qualified immunity, a defense in which "the defendant's subjective intent is simply irrelevant," to claims in which the defendant's improper motive is "an essential component of the plaintiff's affirmative case." Though the Supreme Court reversed the circuit court for imposing on the plaintiff a heightened burden of proof to avoid qualified immunity, the Court firmly rejected the notion that summary judgment based on qualified immunity may not be granted when defendant's intent is at issue. See id. at 600 ("summary judgment serves as the ultimate screen to weed out truly insubstantial lawsuits prior to trial"), 604-05 (Rehnquist, C.J., dissenting), 612 (Scalia, J., dissenting). As relevant here, the majority held that a plaintiff opposing a properly supported summary judgment motion based on qualified immunity "must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." Id. at 600. We applied that standard in affirming the grant of qualified immunity to a correctional officer accused of using excessive

force in violation of the Eighth Amendment on an inmate who was pepper-sprayed when he refused to return to his cell after showering. Burns, 752 F.3d at 1139. We have jurisdiction to review that issue on this appeal.

Jackson's first reason requires more discussion. The district court denied qualified immunity because Jackson's claim that he was not kicking or punching his cell door would permit a fact-finder to find that Gutzmer used the restraint board "for punishment, not to prevent self-harm despite what prison officials say," and "Eighth Circuit precedent makes clear that using a restraint board for punishment as opposed to incapacitation may constitute an Eighth Amendment violation," citing Walker v. Bowersox, 526 F.3d 1186, 1188 (8th Cir. 2008). We conclude this reasoning is wrong as a matter of law.

Qualified immunity is an affirmative defense governed by an objective standard in which "the defendant's subjective intent is simply irrelevant." Crawford-El, 523 U.S. at 588. "The immunity standard in Harlow itself eliminates all motive-based claims in which the official's conduct did not violate clearly established law." Id. at 592. Thus, just as an arresting officer with probable cause to arrest for a particular violation is entitled to qualified immunity even if that was not his motive at the time of arrest, see Peterson v. Kopp, 754 F.3d 594, 599-600 (8th Cir. 2014), Gutzmer is entitled to qualified immunity if the totality of the circumstances justified use of the restraint board even if Gutzmer erred in believing Jackson was self-injurious when placed on the board.

In addition, the district court erred in construing Walker as equating "punishment" of an inmate with an excessive use of force. "The punishment of incarcerated prisoners . . . effectuates prison management and prisoner rehabilitative goals. . . . Discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law."

<u>Sandin v. Conner</u>, 515 U.S. 472, 485 (1995).[2]  A typical punishment for inmate misconduct is punitive segregation, as in <u>Sandin</u>.  But here, because of Jackson's prior misconduct, he was already in the most segregated living unit in the Minnesota prison system.  If Jackson's additional misconduct on May 13, 2014 warranted additional discipline, no Eighth Circuit case, and certainly no Supreme Court case, has ever held that such "punishment" violates the Eighth Amendment.

Turning to the merits of the alleged Eighth Amendment violation, the issue of intent that is an element of Jackson's claim is whether undisputed facts establish that force was applied "in a good-faith effort to maintain or restore discipline," or whether Lt. Gutzmer applied force "maliciously and sadistically to cause harm." <u>Hudson</u>, 503 U.S. at 6-7.[3]  We have jurisdiction to review whether, viewing the facts in the summary judgment record most favorably to Jackson, he "identif[ied] affirmative evidence from which a jury could find that [he] carried his . . . burden of proving" that

---

[2]By contrast, "pretrial detainees . . . cannot be punished at all, much less 'maliciously and sadistically.'" <u>Kingsley v. Hendrickson</u>, 135 S. Ct. 2466, 2475 (2015).

[3]In <u>Key v. McKinney</u>, 176 F.3d 1083, 1086 (8th Cir. 1999), we concluded there was no Eighth Amendment violation when prison officials restrained an inmate with handcuffs connected to a leg chain for twenty-four hours after the inmate threw water on a correctional officer during a work detail.  Though <u>Key</u> involved inmate "restraints," we analyzed the Eighth Amendment issue under the deliberate indifference standard that applies to conditions of confinement cases, rather than the malicious and sadistic standard <u>Whitley</u> applied to excessive force cases.  See also <u>Camp v. Brennan</u>, 54 F. App'x 78, 81 (3d Cir. 2002) (analyzing Eighth Amendment claim of improper use of a four-point restraint as a conditions of confinement claim).  Most excessive force cases involve beatings, physical altercations, or use of force such as Tasers.  When the use of passive restraints is challenged, careful analysis of the factual context may be needed to determine the appropriate substantive standard.  That is not in question here, so we will not further address the issue.

Gutzmer's actions reflected a malicious and sadistic motive. Burns, 752 F.3d at 1139, quoting Crawford-El, 523 U.S. at 600; see Jeffers v. Gomez, 267 F.3d 895, 906-07 (9th Cir. 2001). This issue turns on consideration of far more than whether use of the restraint board was unreasonable because Jackson was not self-injurious. See Whitley, 475 U.S. at 321.

To review again the undisputed facts, Sgt. Weber went to Jackson's cell in response to loud banging and called the ICS team because Jackson may be self-injurious. Before the ICS team and two nurses arrived, Weber had concluded that Jackson was not out of control, he was simply raising a ruckus to get medical attention (which Jackson's Declaration admits). The ICS officers came to the cell and laboriously restrained Jackson so he could be safely taken from his cell to the table where two nurses, summoned from their regular duties, examined Jackson and concluded there was no need for immediate medical attention. Jackson admitted causing a disturbance so that he could bypass prison rules for obtaining medical attention, misconduct warranting discipline. He violated rules for obtaining medical assistance, falsely claimed a medical emergency, and seriously disrupted ACU operations. Thus, "[t]his is not a case where a complete absence of penological purpose raised the reasonable inference that [Lt. Gutzmer] acted maliciously in an effort to cause harm." Burns, 752 F.3d at 1140.[4]

Discipline was warranted after the nurses reported that Jackson had contrived a medical emergency and could safely be placed on the restraint board. Lt. Gutzmer placed Jackson on a restraint board for up to four hours, complying with DOC policies governing its use by videotaping Jackson's placement, obtaining prior medical clearance, and having a nurse make sure his placement on the board was not

_____

[4]Jackson in his Declaration stated that, before Lt. Gutzmer was involved, a correctional officer responding to the third time Jackson improperly pushed his duress button said, "if you don't stop pushing the button and harassing [correctional officers] on rounds with fake requests for help you'll be placed on the [restraint] board."

injurious or painful.  This short-term discipline to induce compliance, while uncomfortable and unpleasant, was unlikely to be painful or to cause physical or psychological harm to an inmate already in punitive segregation.  The restraint conditions in Walker were far less justified and far more painful and likely to harm the inmate.  See 526 F.3d at 1188.  In these circumstances, we must defer to Lt. Gutzmer's judgment that employing this restraint in accordance with the safety precautions required by prison policy was "needed to preserve internal order and discipline and to maintain institutional security."  Hudson, 503 U.S. at 6.  It is not constitutionally significant that the DOC policy generally instructs officials not to use force or restraints as a form of punishment.  See, e.g., Falls v. Nesbitt, 966 F.2d 375, 379-80 (8th Cir. 1992).[5]

As in Burns, we conclude that Jackson presented no evidence whatsoever that Gutzmer's actions "evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur."  Whitley, 475 U.S. at 321.  Jackson argues that, when he was placed on the restraint board, there was no longer a risk of self-injurious behavior, so the evidence demonstrates that Gutzmer placed Jackson on the restraint board "as punishment for seeking medical attention," thereby violating the Eighth Amendment.  But punishing an inmate "to preserve internal order and discipline and to maintain institutional security" does not violate the Eighth Amendment, Hudson, 503 U.S. at 6, unless the punishment or force used is "repugnant to the conscience of mankind," id. at 10 (quotation omitted), like the "degrading and dangerous" hitching post restraint at issue in Hope v. Pelzer, 536 U.S. 730, 745 (2002).  Nor is there evidence of prior contacts or relations between Jackson and Gutzmer that would be specific evidence of a malicious motive to harm.  See Burns, 752 F.3d at 1140.

---

[5]We also conclude that "the extent of the threat to the safety of [Jackson], as reasonably perceived by [Lt. Gutzmer] on the basis of facts known to" him, suggested that "the use of force could plausibly have been thought necessary" to stop Jackson before he injured himself.  Whitley, 475 U.S. at 321.

For these reasons, we conclude that we have jurisdiction over this appeal and the denial of qualified immunity to Lt. Gutzmer must be reversed because the record fails to establish the alleged Eighth Amendment excessive force violation. The Memorandum and Order of the district court dated March 31, 2016 is reversed in part, and the case is remanded with directions to enter summary judgment dismissing the excessive force claim against Lt. Jeff Gutzmer.

_____