# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-3297

_____

Curtis Stewart

*Plaintiff - Appellee*

v.

Anne L. Precythe

*Defendant - Appellant*

Jessieca Wyatt; Stephanie Noisworthy; Cody Stanley; Trevor Proffer; Sergeant Gordon; Hollie Dysinger; William Pettus

*Defendant*s

_____

Appeal from United States District Court
for the Eastern District of Missouri - Cape Girardeau

_____

Submitted: September 26, 2023
Filed: January 30, 2024

_____

Before SHEPHERD, KELLY, and STRAS, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Curtis Stewart, an inmate in the Missouri correctional system, filed this 42 U.S.C. § 1983 action against various Missouri Department of Corrections (MDOC)

officials alleging excessive-force and conditions-of-confinement claims. In response, MDOC Director Anne Precythe filed a motion for judgment on the pleadings asserting, among other things, that she was entitled to qualified immunity. The district court denied Precythe's motion with respect to qualified immunity, and Precythe filed this interlocutory appeal challenging that decision. Having jurisdiction under 28 U.S.C. § 1292, we reverse and remand.

I.

Stewart's claims arise from his treatment as an inmate incarcerated at Eastern Reception Diagnostic Correction Center in Bonne Terre, Missouri. In his First Amended Complaint, Stewart alleges that, on May 19, 2017, while housed in administrative segregation, he was assigned a new cellmate who told him that "[h]e did not want a cellmate" and that "there was going to be a problem" if he was placed in the same cell as Stewart. Stewart notified correctional officer Jessieca Wyatt that he did not feel safe being placed in a cell with this individual and stated that they were "enemies" to avoid being housed in the same cell together. In response to his complaint, Wyatt ordered Stewart to place his hands behind his back so she could handcuff him. After Wyatt secured the handcuffs on Stewart, Stewart told Wyatt that they were too tight on his wrists and were causing him pain. Wyatt told Stewart that the correctional policy was that the handcuffs should be placed on the skin, and then she tightened the cuffs until they dug into his wrists. Wyatt then moved Stewart from the cell and placed him on a steel bench in the housing unit, keeping Stewart's handcuffed hands behind his back, and "shackled [him] to it in a sitting ho[g] tie stress position for over two hours." During this two-hour period, Stewart experienced pain from the handcuffs and his positioning on the bench; however, Wyatt ignored his complaints and requests for assistance, including Stewart's complaint about his buttocks, which he suspected were bleeding. Stewart also requested to use the restroom but, when Wyatt denied his request, he was forced to urinate on himself. When Stewart notified another correctional officer, Cody Stanley, that his handcuffs were too tight and that he was experiencing pain throughout his body, including his rectum, which he suspected was bleeding, Stanley

refused to check the handcuffs and stated, "you shouldn't have checked out of the cell, then you wouldn't have to be worr[ied] about the cuffs being too tight." When Stewart was removed from the bench, Wyatt noticed that Stewart had blood on the back of his pants and taunted him by asking him if he needed a menstrual product. Stewart requested medical care, but Wyatt ignored his request. Instead, Stewart had to care for himself to stop his rectal bleeding. In addition to the rectal bleeding Stewart asserts he suffered from, Stewart also alleges that the restraint caused him to sustain injuries to his wrist, back, and shoulder. Stewart alleges that during the entire encounter, neither Sergeant Gordon—the correctional officer responsible for the supervision of the segregation unit—nor any other correctional officer checked on Stewart or intervened in any manner.

Stewart alleges that a second, similar incident occurred on May 22, 2017, when his cellmate told correctional officers that he did not feel safe in his cell with Stewart. Stewart was again removed from the cell, handcuffed, and "placed on the restraint bench in a sitting hog tie stress position." Stewart complained of pain to the correctional officer who had restrained him, Sergeant Trevor Proffer, specifically identifying pain in his wrist, buttocks, back, legs, and shoulders. His complaints were ignored, and Stewart was also denied use of a restroom, once more being forced to urinate on himself. After Stewart's rectum again started bleeding, he asked Proffer to see a nurse, but Proffer denied his request, stating, "You're going to sit there until your ass look[s] like grilled meat." A third correctional officer, Stephanie Noisworthy, ultimately removed Stewart from the bench but denied his second request to see a nurse.

Stewart thereafter filed this action alleging, as relevant to this appeal, excessive-force and conditions-of-confinement claims against Precythe in her official and individual capacities. Stewart alleges that, as the director of the MDOC, Precythe "promulgated and acquiesced [in] a policy and practice of cruel and unusual punishment of excessive force by handcuffing and shackling prisoners confined in administrative segregation units to a steel bench in a sitting hog tied position for hours," which "causes unnecessary pain and suffering without

-3-

immediate access to food or water." Stewart further asserts that Precythe, "at all relevant times[,] authorized the policy and a practice of excessive use of force throughout the [MDOC]."

Precythe filed a motion for judgment on the pleadings, asserting that Stewart's claims against her were barred by sovereign immunity, respondeat superior, and qualified immunity. She also asserted that Stewart failed to plead exhaustion of administrative remedies. The district court granted the motion in part and denied the motion in part, granting the motion only insofar as Stewart sought monetary damages for the official capacity claims against Precythe. As relevant here, the district court denied the motion for qualified immunity, concluding that "Stewart has sufficiently alleged that Precythe violated a constitutional right that was clearly established at the time of the alleged violation—the right to be free of excessive use of force." Precythe appeals the denial of qualified immunity.

II.

Precythe asserts that the district court erred in denying judgment on the pleadings based on qualified immunity because she did not violate Stewart's constitutional rights by formulating a policy that allowed the use of restraint benches, and, even if a constitutional violation did occur, it is not clearly established that such a restraint-bench policy violates an inmate's constitutional rights. Precythe further asserts that she was not involved in the conduct that Stewart alleges constituted cruel and unusual punishment. We review de novo a district court's denial of a defendant's motion for judgment on the pleadings based on qualified immunity. Martinez v. Sasse, 37 F.4th 506, 508-09 (8th Cir. 2022). "We have limited jurisdiction over interlocutory appeals involving qualified immunity. We do not have jurisdiction to resolve factual disputes, but we have jurisdiction to consider *de novo* the legal question of whether [an official is] entitled to qualified immunity." Baude v. Leyshock, 23 F.4th 1065, 1071 (8th Cir. 2022). To prevail on a motion for judgment on the pleadings based on qualified immunity, the official "must show [she is] 'entitled to qualified immunity "on the face of the complaint."'" Id. (citation

-4-

omitted). Our review is "limited to the facts alleged in [the] complaint, which we accept as true and view most favorably to [Stewart]." Id. at 1069.

When a public official asserts qualified immunity as a defense, a plaintiff can overcome the defense by showing "that [the defendant] violated a constitutional right, and that the unlawfulness of her conduct was clearly established at the time." Martinez, 37 F.4th at 509. To satisfy the clearly established prong, "the law must be 'sufficiently clear' at the time of the officer's conduct 'that every reasonable official would understand that what [s]he is doing is unlawful.' Clearly established law must not be defined at a 'high level of generality'; rather, the 'violative nature of particular conduct' must be clearly established." Id. (alteration in original) (citation omitted). "[W]e may conduct this inquiry in any order and resolve this inquiry on either prong, regardless of the order chosen by the district court." Brown v. City of St. Louis, 40 F.4th 895, 899-900 (8th Cir. 2022).

"To state a claim under § 1983, the plaintiff must plead that a government official has personally violated the plaintiff's constitutional rights." Jackson v. Nixon, 747 F.3d 537, 543 (8th Cir. 2014). "In a § 1983 case an official 'is only liable for his . . . own misconduct' and is not 'accountable for the misdeeds of [his] agents' under a theory such as respondeat superior or supervisor liability." Nelson v. Corr. Med. Servs., 583 F.3d 522, 534-35 (8th Cir. 2009) (en banc) (alterations in original) (citation omitted). Here, Stewart makes no allegations that Precythe was personally involved in the two incidents where Stewart was restrained. See Appellee Br. 7-8 ("Appellee concedes that Appellant did not handcuff him, Appellant did not hog tie him to a bench for no reason, and Appellant did not ignore his pleas."). However, "a supervisor may still be liable under § 1983 if either h[er] direct action or h[er] 'failure to properly supervise and train the offending employee' caused the constitutional violation at issue." Jackson, 747 F.3d at 543 (citation omitted). Where, as here, "a supervisor is not involved in day-to-day operations, [her] personal involvement may be found if [s]he is involved in 'creating, applying, or interpreting a policy' that gives rise to unconstitutional conditions." Id. (citation omitted).

-5-

"'After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment.' What constitutes the 'unnecessary and wanton infliction of pain' varies based on the alleged constitutional violation." Jackson v. Gutzmer, 866 F.3d 969, 974 (8th Cir. 2017) (citation omitted). For an excessive-force claim, "[w]henever prison officials stand accused of using excessive physical force . . . the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. (citation omitted). In conducting this inquiry, we focus on "such factors as the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted." Whitley v. Albers, 475 U.S. 312, 321 (1986) (alteration in original). After considering these factors, we may draw "inferences . . . as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." Id. Finally, "[t]he word 'sadistically' is not surplusage; '"maliciously" and "sadistically" have different meanings, and the two together establish a higher level of intent than would either alone.'" Gutzmer, 866 F.3d at 974 (citation omitted).

In contrast, for a conditions-of-confinement claim, "[t]he Eighth Amendment standard . . . is whether the defendants acted with deliberate indifference." Reynolds v. Dormire, 636 F.3d 976, 979 (8th Cir. 2011) (citation omitted). "Deliberate indifference . . . is the equivalent of criminal recklessness: the defendant must be 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Hodges v. Minn. Dep't of Corr., 61 F.4th 588, 592 (8th Cir. 2023) (citation omitted). We will find deliberate indifference only where the official "actually knows of the substantial risk and fails to respond reasonably to it. This standard incorporates 'due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions.'" Id. (citation omitted).

At the outset, we must consider precisely what Stewart's excessive-force claim alleges with respect to Precythe. The dissent asserts that Stewart's complaint alleges that Precythe authorized a policy and practice of excessive force, which was applied "without provocation or need to maintain or restore discipline." See R. Doc. 76, at 6. While Stewart's complaint indeed contains this quoted language, it is found within the legal conclusion that the alleged policy or practice "constitutes cruel and unusual punishment." R. Doc. 76, at 6. The only other language in the complaint that could charitably be read as alleging the same is the statement that MDOC correctional officers used the restraint policy "pretextually as a safety and security measure." R. Doc. 76, at 3. Again, this "naked assertion," which lacks "further factual enhancement[,] . . . stops short of the line between possibility and plausibility of 'entitle[ment] to relief.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007) (third alteration in original) (citation omitted); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." (citation omitted)).

The complaint, construed in the light most favorable to Stewart, does not plausibly allege Precythe authorized a restraint policy permitting jailers to use excessive force where it was unnecessary or unprovoked. Similarly, the complaint does not plausibly allege that Precythe acquiesced in any such practice of unprovoked or unwarranted excessive force because it fails to allege a pattern of such conduct, instead alleging only two distinct occasions where Stewart was restrained. See Dean v. Cnty. of Gage, 807 F.3d 931, 940 (8th Cir. 2015) (stating that, in the context of Monell liability, the question is whether officials with decision-making authority "affirmatively command[ed]" that conduct occur through official policy or "acquiesce[d] in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity"). The plausible allegations of excessive force are focused entirely on the degree of force; Stewart alleges that he was subjected to excessive force solely because of the manner and duration of the restraint he endured.

Considering only the plausible allegations and taking them as true—that Precythe "promulgated and acquiesced [in] a policy . . . of . . . handcuffing and shackling prisoners confined in administrative segregation units to a steel bench in a sitting hog tied position for hours"—Precythe is entitled to qualified immunity under either an excessive-force or conditions-of-confinement claim because Stewart has failed to allege that Precythe committed a constitutional violation. Although Stewart makes several allegations about the treatment he received from various correctional officers—ranging from ignoring his requests for help to taunting Stewart upon realizing he was injured—his complaint alleges that Precythe's only personal involvement was the authorization and promulgation of the policy at issue. Because Precythe "is only liable for [her] . . . own misconduct," Nelson, 583 F.3d at 534-35 (citation omitted), our review is limited to her conduct in relation to acquiescing to and promulgating the alleged restraint policy.

This Court has had occasion to consider Eighth Amendment claims in the context of prisoner restraint, providing parameters for when a specific restraint amounts to a constitutional violation. In Key v. McKinney, this Court upheld judgment in favor of correctional officers on a conditions-of-confinement claim where the plaintiff alleged that, pursuant to facility policy, he had been shackled for twenty-four hours with routine checks by a nurse and correction officers, concluding that no Eighth Amendment violation occurred. 176 F.3d 1083, 1085-86 (8th Cir. 1999). Further, in Gutzmer, this Court held that a prison official was entitled to qualified immunity on an excessive-force claim when he restrained an unruly prisoner on a restraint board for up to four hours, in compliance with correctional facility policy, because there was no evidence that the use of the restraint board was a wanton and unnecessary infliction of pain. 866 F.3d at 977. There, the Court also remarked that "punishing an inmate 'to preserve internal order and discipline and to maintain institutional security' does not violate the Eighth Amendment unless the punishment or force used is 'repugnant to the conscience of mankind.'" Id. at 978 (citation omitted). Further, where this Court has found that correctional officials were not entitled to qualified immunity, the duration of the restraint differed markedly from the alleged duration of the restraint here. See Walker v. Bowersox,

526 F.3d 1186, 1188 (8th Cir. 2008) (per curiam) (concluding that prison officials were not entitled to qualified immunity after prisoner was restrained on a bench for twenty-four hours with no access to food, water, or a restroom because triable issues existed as to whether imposing such conditions was excessive and constituted a disproportionate use of force).

Considering the foregoing precedent, Stewart's allegations against Precythe fall short of demonstrating a constitutional violation. Without additional facts, Stewart's allegation that Precythe promulgated a policy of handcuffing and shackling a prisoner to a bench for a period of hours, coupled with his allegation that on two occasions he was restrained for over two hours, do not, on their own, violate the Eighth Amendment. Indeed, the allegations against Precythe regarding the restraint policy represent the kind of punishment necessary "to preserve internal order and discipline and to maintain institutional security," and there are no allegations that Precythe's conduct in adopting and promulgating the policy is "repugnant to the conscience of mankind." Gutzmer, 866 F.3d at 978 (citation omitted). Notably, the alleged duration of the restraint here is significantly shorter than the durations in Key and Gutzmer, and there are no allegations against Precythe that suggest the restraint policy directed the same kind of conduct that this Court found precluded qualified immunity in Walker. Stewart's allegations against the other defendants, including that he was taunted and denied medical care, food, water, or restroom breaks, are untethered from his allegations regarding the policy that Precythe allegedly promulgated. The policy, as defined by Stewart, coupled with Precythe's conduct in acquiescing to or promulgating it, does not violate the Eighth Amendment.

To the extent that Stewart relies on the use of a "hog tie" restraint to demonstrate that the policy is unconstitutional, see, e.g., Goode v. Baggett, 811 F. App'x 227, 229, 237 (5th Cir. 2020) (affirming denial of summary judgment on excessive-force claim based on qualified immunity where officers hog tied individual—by binding individual's ankles to his wrist, behind his back, with less than a foot of separation—in a drug-induced psychosis and placed him in a prone

-9-

position for an extended period of time), we note that Stewart's complaint alleges only that he was placed in a "sitting hog tie stress position," failing to make any allegations about what precisely this method of restraint entails. Indeed, when pressed about the definition of "hog tie" at oral argument, Stewart's counsel offered a factual description, but conceded that his description of the restraint was contained nowhere in the complaint. See Oral Arg. at 17:21-18:18 ("I'll . . . answer the way hog tie was meant to be used. So, the prisoner's hands are behind their back. Then what's done is they're handcuffed behind their back, then the handcuffs are placed on their legs, which are then pulled up more towards the bench, so what it's doing is it's putting stress on their arms, stress on their legs, and then pulling those together to handcuff to the bench further which is giving this sort of of a pig being hog tied legs to hands just the bench is the middle ground. . . . I was only adding that factual description as asked by the Court. I would concede though that the actual definition or description of sitting hog tied is not contained in the complaint.").[1] Further, other courts have recognized that "hog tie" does not have a universal definition. See, e.g., Cruz v. City of Laramie, 239 F.3d 1183, 1188 (10th Cir. 2001) ("We note that while sister circuits may characterize the hog-tie restraint somewhat differently, we understand such to involve the binding of the ankles to the wrists, behind the back, with 12 inches or less of separation.").

Although we must view the allegations in Stewart's favor, without any additional factual description of the restraint, labeling it a "hog tie" does not make out a constitutional violation. See Ashcroft, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor [will] 'naked assertion[s]' devoid of 'further factual enhancement.'" (second alteration in original) (citation omitted)); see also Gutierrez v. City of San Antonio, 139 F.3d 441, 443 (5th Cir. 1998) (considering excessive-force claim involving use of "hog tie," which record reflected involved using "a nylon rope with a loop on one end and a clasp on the other . . . [to] place[e] the loop

---

[1]We are by no means certain that the description supplied by counsel at oral argument would cure the insufficiency in the complaint's allegations.

around [plaintiff's] feet, and . . . link[] the clasp around the handcuffs, drawing [plaintiff's] legs backward at a 90-degree angle in an 'L' shape"). There is no record here on a motion for judgment on the pleadings; instead, we are left only with the allegation that Stewart was restrained to a bench with his hands and feet behind his back for a period of two hours on two occasions, which, as described above, does not amount to a constitutional violation committed by Precythe. Finding no allegation of a constitutional violation in the complaint, we need not consider whether the right was clearly established to conclude that Precythe is entitled to qualified immunity. Kulkay v. Roy, 847 F.3d 637, 642 (8th Cir. 2017) ("Because an official is entitled to qualified immunity unless both prongs are satisfied, our analysis will end if either of the two is not met."). However, even assuming that Stewart plausibly alleged a constitutional violation, we note that there is no "controlling authority . . . [or] 'robust consensus of cases of persuasive authority'" establishing that the conduct violated the Constitution. Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011) (citation omitted). As described above, our Circuit's case law has never held that the use of restraint benches is per se unconstitutional, and it has found restraint policies involving longer durations than the one at issue here to pass constitutional muster. In light of the foregoing, we cannot say there is any controlling authority or a robust consensus of persuasive authority that would satisfy the clearly established prong. We therefore conclude that the district court erred in denying qualified immunity to Precythe.

III.

For the foregoing reasons, we reverse and remand for proceedings consistent with this opinion.

KELLY, Circuit Judge, dissenting.

In his First Amended Complaint, Stewart brought claims of excessive force against multiple MDOC employees, including Director Precythe. Stewart alleged that Precythe promulgated a policy that authorized conduct that violated the Eighth

Amendment. Precythe filed a motion pursuant to Fed. R. Civ. P. 12(c), which the district court dismissed after finding that she was not entitled to qualified immunity at the pleadings stage. The district court concluded that Stewart sufficiently alleged that Precythe authorized a policy and practice of using excessive force at MDOC and found that Stewart's right to be free of excessive force was clearly established. I would affirm that ruling.

"At this early stage of the litigation, to warrant reversal, '[Precythe] must show that [she is] entitled to qualified immunity on the face of the complaint.'" Dadd v. Anoka Cnty, 827 F.3d 749, 754 (8th Cir. 2016) (quoting Bradford v. Huckabee, 394 F.3d 1012, 1015 (8th Cir. 2005)). Precythe does not meaningfully contest that in the First Amended Complaint, Stewart alleged (1) that Precythe "authorized the policy and a practice of excessive use of force," and (2) that the force used was excessive because it was "without provocation or need to maintain or restore discipline." And the excessive force the policy sanctioned came in the form of "handcuffing and shackling prisoners confined in administrative segregation units to a steel bench in a sitting hog-tied position for hours."

Stewart further alleged that Precythe, as MDOC Director, was "solely responsible for approving and promulgating these practices of excessive use of force." Accepting these facts as true, as we must do at this stage, Stewart sufficiently alleged Precythe's involvement in the unconstitutional conduct for purposes of § 1983. See Jackson v. Nixon, 747 F.3d 537, 544-45 (8th Cir. 2014) (denying qualified immunity at the pleadings stage to prison directors, including the director of MDOC, who were alleged to be personally involved in establishing and maintaining an allegedly unconstitutional offender treatment program); Bonner v. Outlaw, 552 F.3d 673, 679 (8th Cir. 2009) (denying qualified immunity at the pleadings stage to a prison warden who declared "he ha[d] no personal involvement in" the alleged constitutional violation because "[the prisoner] may be able to prove," after discovery, that "[the warden] was personally involved in creating, applying, or interpreting a[n] [unconstitutional] policy" (citation omitted)); see also Messimer v. Lockhart, 702 F.2d 729, 732 (8th Cir. 1983) (noting that the Director of

the Arkansas Department of Correction "may be [held] responsible for his own failure" to correct an unconstitutional policy when he had the authority to change the complained-of policies instituted by the warden).

Stewart also alleged facts about how the policy was carried out against him. In May 2017, Stewart was in MDOC custody and housed in an administrative segregation unit. First, on May 19, 2017, Stewart was assigned a cellmate. The cellmate made it clear that "he did not want a cellmate" and that if Stewart was placed in the cell with him, "there was going to be a problem." Stewart notified a correctional officer that he did not feel safe in the cell. Stewart was then handcuffed, removed from the cell, and placed on a steel bench where he was shackled in a seated hog tie[2] position for over two hours. Stewart experienced full-body pain, especially in his shoulders, arms, wrists, legs, back, and ankles. Stewart was not permitted to use the toilet, and his complaints of "extreme and insufferable pain" were ignored. When he was released from the bench, he had blood on the back of his pants and resorted to "plac[ing] toilet paper in his rectum to help stop the bleeding."

Second, on May 22, 2017, Stewart was given another cellmate. This time, the cellmate said he did not feel safe. In response, an officer again ordered Stewart to the restraint bench, where he was placed in the same position as he was three days prior. Stewart told the officer that he was in pain—feeling it especially in his swollen wrist, and his buttocks, back, legs, and shoulders—but his complaints "went unanswered." He was again denied the use of a toilet, and his "rectum began to bleed." He was restrained on the bench for over two hours. Stewart continues to suffer joint and nerve damage and pain as a result.

Precythe argues that the alleged policy does not violate a clearly established constitutional right because prisons may lawfully use restraint benches. But Precythe reads the First Amended Complaint too narrowly. Stewart did not allege that

_____

[2]However "hog tie" is defined, a reasonable inference is—at least as the term is used here—that it describes a method for cuffing and restraining a person in a painful "stress position."

-13-

Precythe promulgated a policy regarding the use of restraint benches. He alleged that Precythe promulgated a policy that authorized the use of excessive force "without provocation or need to maintain or restore discipline." Even if the use of restraint benches is not per se unconstitutional, Precythe does not dispute that use of the restraint bench is a form of force. Force may be used in a prison setting to "resolve a disturbance." Whitley v. Albers, 475 U.S. 312, 320 (1986). But Stewart alleged a situation where the use of force was not warranted at all. Hudson v. McMillian, 503 U.S. 1, 7 (2002) ("In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" (quoting Whitley, 475 U.S. at 321)). There is nothing in the First Amended Complaint to indicate that Stewart provoked the response of the correctional officers or that he engaged in conduct that threatened their ability to maintain or restore discipline. Rather, as alleged, MDOC's use of force—which included placement on the restraint bench—was triggered when Stewart or his assigned cellmate expressed concerns about their cell assignments.

It is clearly established law that the use of force where none is warranted, in a prison setting, violates the Eighth Amendment. Hickey v. Reeder, 12 F.3d 754, 758 (8th Cir. 1993) ("In this case we find that there was no need for physical force to compel Hickey to sweep his cell. Hickey was not physically threatening the officers, nor was the stun gun applied for that reason. The relationship between the need for force (zero) and the force used (a painful and incapacitating shock) was excessive. And the pain inflicted was substantial."); Hudson, 503 U.S. at 6–7 ("[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.").

In this case, nothing in the First Amended Complaint suggested that "prison security and order" were in any way "placed in jeopardy," so there was no need for

the use of any force at all, let alone the use of the restraint bench. <u>Hickey</u>, 12 F.3d at 759 (citations omitted); <u>see</u> <u>Walker v. Bowersox</u>, 526 F.3d 1186, 1188 (8th Cir. 2008) (finding "trialworthy issues as to whether [restraining an inmate on a bench for 24 hours and denying him food or water or access to a toilet] to make him accept a specific cell mate was an excessive and disproportionate use of force") (citations omitted); <u>see also</u> <u>Treats v. Morgan</u>, 308 F.3d 868, 874 (8th Cir. 2002) (concluding that the plaintiff met his burden of showing a constitutional violation at summary judgment because, viewing the evidence in the light most favorable to plaintiff, "there was no objective need for the degree of force used or the pain inflicted [and defendants] could not reasonably have perceived [the plaintiff] to be a threat to themselves or institutional security at the time").

Taking all facts alleged in the First Amended Complaint as true, and drawing all inferences in his favor, as we must, Stewart has made out a claim against Precythe in her individual capacity based on her promulgation of a policy authorizing the use of force where none is required.

I respectfully dissent.

_____